UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORENZO BROWN,

                Petitioner,

                                  CASE NO. 21-CV-10412
v.                                 HONORABLE MARK A. GOLDSMITH

BECKY CARL,

                Respondent.

_____/

**OPINION AND ORDER
(1) DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, (2) DENYING A
CERTIFICATE OF APPEALABILITY, AND (3) DENYING LEAVE TO PROCEED IN
FORMA PAUPERIS ON APPEAL**

## I.    Introduction

This is a pro se habeas case brought pursuant to 28 U.S.C. § 2254.  Michigan prisoner

Lorenzo Brown was convicted of assault with intent to commit murder, Mich. Comp. L. § 750.83,

carrying a weapon with unlawful intent, Mich. Comp. L. § 750.226, felon in possession of a

firearm, Mich. Comp. L. § 750.224f, and possession of a firearm during the commission of a felony

(second offense), Mich. Comp. L. § 750.227b, following a joint jury trial with co-defendants Teri

Johnson and Waddell Burney in the Wayne County Circuit Court.  Brown was sentenced, as a

fourth habitual offender, Mich. Comp. L. § 769.12, to 41 years 8 months to 62 years 5 months

imprisonment on the assault conviction, concurrent terms of 5 to 10 years imprisonment on the

carrying a weapon and felon in possession convictions, and a consecutive term of 5 years

imprisonment on the felony firearm conviction in 2015.  In his pleadings, Brown raises claims

concerning the effectiveness of trial counsel, the denial of a mistrial motion based upon a

courtroom closure, and the validity of his sentences.   Respondent Becky Carl has filed an answer to the habeas petition contending that it should be denied.   For the reasons set forth below, the Court concludes that Brown is not entitled to relief on his claims and that the habeas petition must be denied.   The Court also concludes that a certificate of appealability and leave to proceed in forma pauperis on appeal must be denied.

## II.      Facts and Procedural History

Brown's convictions arise from a shooting incident outside a liquor store in Detroit, Michigan on November 22, 2014.   The Michigan Court of Appeals described the relevant facts, which are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1); Wagner v. Smith, 581 F.3d 410, 413 (6th Cir. 2009), as follows:

> Defendants' convictions arise from the nonfatal shooting of Jamil Dismuke outside the Sam D Liquor Store in Detroit. On the night of November 22, 2014, Dismuke was walking toward the door of the store. His brother, Demond Davis, was outside the store, and their uncle, Richard Davis, was inside the store. A witness, Ashlee Kennedy, was also outside the store. Witnesses heard a barrage of gunshots, one of which struck Dismuke in the leg, causing him to fall in the store parking lot. After Richard pulled Demond inside the store, one of the defendants, allegedly Lorenzo Brown, came across the street, stood over Dismuke, and shot him in the head at close range. Richard and Demond observed this shooting on a security camera monitor inside the store. Dismuke recovered from the shooting, but sustained some degree of mental impairment.

> The prosecution's theory at trial was that all three defendants were involved in firing gunshots at Dismuke, and that it was defendant Brown who shot Dismuke in the head. Kennedy initially told the police that she did not know the identities of the shooters, but she later testified pursuant to an investigative subpoena that she knew the shooters by their nicknames. She identified Brown as the person who shot Dismuke in the head. At trial, Richard testified that he saw the three defendants at the corner outside the store before the shooting started.   He did not know who shot Dismuke in the head. Demond identified the defendants as the persons being at the scene. He identified Brown as the person who shot Dismuke in the head based on his observations of the shooter's clothing on the store security video.   Dismuke identified Brown as the person who shot him in the head and identified Johnson and Burney as the other individuals who shot at him.

3

> Defendants were tried jointly before a single jury. Before trial, the trial court denied Burney's motion for a separate trial. The primary factual issue at trial was the credibility of Kennedy, Richard Davis, and Demond Davis. The prosecutor introduced the video footage from the store surveillance cameras, but the officer who obtained a copy of the video footage from the store inadvertently failed to capture approximately one minute of feed from one of the cameras. This was the camera that would have recorded the point-blank shooting of Dismuke. The jury convicted all three defendants of the weapons charges. In addition, it convicted Brown of assault with intent to commit murder, but convicted Burney and Johnson of the lesser offense of assault with intent to do great bodily harm less than murder.

People v. Brown, No. 327734, 2016 WL 6992194, at *1–*2 (Mich. Ct. App. Nov. 29, 2016).

Following his convictions and sentencing, Brown filed an appeal of right with the Michigan Court of Appeals, essentially raising the same claims presented on habeas review. The Michigan Court of Appeals denied relief on the ineffective assistance of trial counsel claims, remanded the case to the trial court for further proceedings on the courtroom closure claim, and reserved ruling on the sentencing claims pending the remand. Id. at *2–*8. Brown did not seek leave to appeal with the Michigan Supreme Court.

The trial court conducted a hearing on remand, during which several witnesses testified, including the prosecutor, the defense attorneys, and the defendants. See 1/23/17 Hr'g, (Dkt. 12-18). At the close of the hearing, the trial court found that the courtroom closure was a partial closure because people (including those associated with the defendants) were escorted out of the courtroom for the testimony of a witness who felt threatened. The trial court then set forth the reasons for the partial closure, including witness intimidation and shielding the jury from prejudice. Id. at PageID.1380–1386. The case then returned to the Michigan Court of Appeals, which accepted the trial court's reasoning and rejected the courtroom closure claim on the merits, denied relief on the habitual offender sentencing claim, and remanded for a hearing (a Crosby

4

remand) based upon People v. Lockridge, 870 N.W.2d 502 (Mich. 2015).   People v. Brown, No. 327734, 2017 WL 1367178, at *1–*8 (Mich. Ct. App. Apr. 13, 2017).   Brown also filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order.   People v. Brown, 901 N.W.2d 383 (Mich. 2017).

On remand, the trial court conducted a hearing, ruled that certain offense variables were not scored based upon judicial fact-finding, scored the disputed offense variables the same as it had previously, and concluded that it would not change Brown's original sentences.   See 12/18/17 Hr'g (Dkt. 12-20).   Brown filed an appeal of right with the Michigan Court of Appeals, which affirmed his sentences.   People v. Brown, No. 344796, 2019 WL 2194994, at *1–*3 (Mich. Ct. App. May 21, 2019).   Brown also filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order.   People v. Brown, 935 N.W.2d 324 (Mich. 2019).

Brown thereafter filed his federal habeas petition.   He raises the following claims:

I.     He was denied his Sixth Amendment constitutional right to effective assistance of counsel when trial counsel failed to move for a dismissal due to the failure of the police to preserve key evidence that would have exonerated him and failed to object to the jury finding him guilty of the felony firearm charge when the jury was not read this instruction as it pertained to him.

II.    He was denied due process and a fair trial when his motion for a mistrial should have been granted.

III.   He is entitled to re-sentencing because: his Fifth and Fourteenth Amendment rights to due process and fair trial were violated because (i) the scoring of the offense variables can only occur through improper judicial fact-finding, and the 500-month, consecutive to 5-year, minimum sentence imposed is not reasonable considering he would be 75 years old if he makes it to his earliest release date; and (ii) he should not have been sentenced as a habitual offender.

5

Carl has filed an answer to the habeas petition contending that it should be denied because the claims lack merit.   Brown has filed a reply to that answer.

## III.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 et seq., sets forth the standard of review that federal courts must use when considering habeas petitions brought by prisoners challenging their state court convictions.   The AEDPA provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'"   Mitchell v. Esparza, 540 U.S. 12, 15–.16 (2003) (per curiam) (quoting Williams v. Taylor, 529 U.S. 362, 405–406 (2000)); see also Bell v. Cone, 535 U.S. 685, 694 (2002).   "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing

legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams, 529 U.S. at 413); see also Bell, 535 U.S. at 694.   However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.   The state court's application must have been 'objectively unreasonable.'"   Wiggins, 539 U.S. at 520–521 (citations omitted); see also Williams, 529 U.S. at 409.   The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997), and 'demands that state-court decisions be given the benefit of the doubt.'"   Renico v. Lett, 559 U.S. 766, 773 (2010) (quoting Lindh, 521 U.S. at 333, n. 7); Woodford v. Viscotti, 537 U.S. 19, 24 (2002) (per curiam)).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).   The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."   Id. at 102.   (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)).   Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.   Id.   Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."   Id. at 103;

see also White v. Woodall, 572 U.S. 415, 419–420 (2014). Federal judges "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." Woods v. Donald, 575 U.S. 312, 316 (2015). A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. Woods v. Etherton, 578 U.S. 113, 118 (2016).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. Williams, 529 U.S. at 412; see also Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting Wright v. Van Patten, 552 U.S. 120, 125–126 (2008) (per curiam)); Lockyer, 538 U.S. at 71–72 (2003). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington, 562 U.S. at 100. Furthermore, it "does not require citation of [Supreme Court] cases—indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (emphasis in original); see also Mitchell, 540 U.S. at 16. The requirements of clearly established law are to be determined solely by Supreme Court precedent. Thus, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court'" and it cannot provide the basis for federal habeas relief. Parker v. Matthews, 567 U.S. 37, 48–49 (2012) (per

curiam); see also Lopez v. Smith, 574 U.S. 1, 2 (2014) (per curiam).   The decisions of lower federal courts, however, may be useful in "assessing the reasonableness of the state court's resolution of an issue."   Stewart v. Erwin, 503 F.3d 488, 493 (6th Cir. 2007) (citing Williams v. Bowersox, 340 F.3d 667, 671 (8th Cir. 2003)); Dickens v. Jones, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. See 28 U.S.C. § 2254(e)(1).   A habeas petitioner may rebut this presumption only with clear and convincing evidence.   Warren v. Smith, 161 F.3d 358, 360–361 (6th Cir. 1998).   Moreover, habeas review is "limited to the record that was before the state court."   Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

## IV.   Discussion

### A.   Ineffective Assistance of Trial Counsel Claims

Brown first asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to (i) seek dismissal due to the police failure to preserve a store surveillance recording of the incident and (ii) object to the felony firearm guilty verdict because the felony firearm jury instruction did not include his name.   Carl contends that these claims lack merit.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received ineffective assistance of counsel.   First, a petitioner must prove that counsel's performance was deficient.   This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment.   Strickland, 466 U.S. at 687.   Second, the petitioner must

establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. Id.

As to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. Id. at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. Id. at 689. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Id. at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy. Id. at 689.

To satisfy the prejudice prong under Strickland, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. Id. On balance, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." Id. at 686.

The Supreme Court has confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and deference accorded state appellate courts reviewing their performance. "The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Harrington, 562 U.S. at 105 (punctuation modified, citations omitted). "When § 2254(d) applies, the question is not

10

whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.   Id.

Brown first asserts that trial counsel was ineffective for failing to seek dismissal of the charges based upon the police/prosecution failure to preserve the complete store surveillance video of incident.   The Michigan Court of Appeals denied relief on this claim.   The court explained in relevant part:

> Brown argues that his trial counsel was ineffective for failing to move for dismissal based on the prosecutor's failure to preserve the full video recording from the store's surveillance system.   A defendant's due process right to evidence has been recognized in cases such as Brady v. Maryland, 373 U.S. 83; 83 S Ct 1194; 10 L.Ed.2d 215 (1963), and Arizona v. Youngblood, 488 U.S. 51; 109 S Ct 333; 102 L.Ed.2d 281 (1988).   A criminal defendant has a due process right to obtain exculpatory evidence possessed by the state if it would raise a reasonable doubt about the defendant's guilt.   Brady, 373 U.S. at 87; see also People v. Stanaway, 446 Mich. 643, 666; 521 NW2d 557 (1994).   In Brady, 373 U.S. at 87, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To establish a Brady violation, a defendant must establish (1) that the prosecution has suppressed evidence, (2) that is favorable to the accused, and (3) when viewed in its totality, is material. People v. Chenault, 495 Mich. 142, 155; 845 NW2d 731 (2014); see also People v. Stokes, 312 Mich. App. 181, 190; 877 NW2d 752 (2015), lv pending.
>
> In Youngblood, 488 U.S. at 58, the Court held that the failure to preserve potentially useful evidence does not constitute a denial of due process absent a showing of bad faith by the police.   To establish a Youngblood violation, "the defendant must show: (1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." United States v. Jobson, 102 F3d 214, 218 (CA 6, 1996).
>
> In this case, there is no evidence that the police acted in bad faith in failing to obtain recorded video footage for the full relevant time span from camera 2. Sergeant Sullivan testified that the omission was inadvertent.   Brown had the opportunity to cross-examine Sullivan, but did not elicit any testimony suggesting that he acted in bad faith. Moreover, Brown failed to demonstrate that the missing

11

video footage was favorable to him, or that it had any apparent exculpatory value before its destruction. The prosecutor never saw the missing video footage. Richard and Demond were the only two witnesses to observe the video. Richard stated that he saw a person run up to Dismuke and stand over him, but he could not see what the person did. Demond testified that the video depicted Brown shooting Dismuke. Although Demond admitted that he could not see the shooter's face in the video, he recognized Brown by the clothing he had seen Brown wearing minutes before the shooting. When these witnesses' testimony is considered with testimony that the light outside the store was "dull," it appears that viewers could not determine whether Brown was the shooter in the video unless they had seen Brown's clothing immediately before the shooting.

Brown's affidavit also fails to provide support for his claim of ineffective assistance of counsel. Brown asserted his actual innocence and stated that if the jury had been able to see the recording from camera 2, "they would have seen that the person who shot Jamil Dismuke in the head did not do it execution style and that fact would have directly contradicted the testimony of the witnesses." Brown also cited Kennedy's conflicting statements. He argues that Kennedy's cousin shot Dismuke, and that Kennedy incriminated Brown to protect her cousin and to satisfy the prosecutor's demands. The affidavit also avers that the prosecutor promised favorable treatment in this case in exchange for Brown's assistance in solving other homicides. Brown's affidavit was not executed until after trial, and therefore could not have been offered in support of a motion to suppress. In addition, his alleged meeting with the prosecutor occurred in September 2015, five months after the trial. Brown's assertion that the video would have shown that Dismuke was not shot "execution style" is unconvincing because he does not explain why the shooting could or could not be considered "execution style," or why walking up to Dismuke after he had been shot in the leg and shooting him in the head at close range in some manner other than "execution style" could mitigate the shooter's guilt of assault with intent to commit murder. Regardless of the "style" of the shooting, the undisputed evidence that Dismuke had a bullet wound near his ear, fired from close range, cannot be reconciled with any theory that the shooter acted with other than an intent to commit murder.

Under these circumstances, Brown cannot establish that counsel's failure to file a motion to dismiss was either objectively unreasonable or outcome determinative. Douglas, 496 Mich. 592. Counsel is not ineffective for failing to make a futile motion. People v. Ericksen, 288 Mich. App. 192, 201; 793 NW2d 120 (2010).

People v. Brown, No. 327734, 2016 WL 6992194, at *6–*7 (Mich. Ct. App. Nov. 29, 2016).

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. It is well-settled that there is no general

constitutional right to discovery in a criminal case.   Weatherford v. Bursey, 429 U.S. 545, 559 (1977); United States v. Presser, 844 F.2d 1275, 1281 (6th Cir. 1988).   A prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."   Brady v. Maryland, 373 U.S. 83, 87 (1963).   Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."   United States v. Bagley, 473 U.S. 667, 682 (1985); see also Kyles v. Whitley, 514 U.S. 419, 432–436 (1995).   Material evidence is that which is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce."   United States v. Clark, 988 F.2d 1459, 1467 (6th Cir. 1993).   The duty to disclose favorable evidence includes the duty to disclose impeachment evidence.   Bagley, 473 U.S. 667; Giglio v. United States, 405 U.S. 150, 154–155 (1972).   While due process requires a prosecutor to disclose exculpatory evidence, it "does not require the government to create exculpatory material that does not exist."   Stadler v. Curtin, 682 F. Supp. 2d 807, 819 (E.D. Mich. 2010) (citing cases); see also Dallas v. Holmes, 137 F. App'x 746, 754 (6th Cir. 2005).

The Supreme Court has made clear that due process requires that police (and prosecutors) preserve clearly exculpatory evidence in their possession that might not be available to a defendant through other means.   California v. Trombetta, 467 U.S. 479, 489 (1984).   If such evidence is destroyed, a due process violation occurs irrespective of the good or bad faith of the police.   To prevail on such a claim, a defendant must show that the police destroyed evidence with "an exculpatory value that was apparent before it was destroyed."   Id.

In contrast, when the police only fail to preserve "potentially useful" evidence that might have been exculpatory, a defendant must prove that the police acted in bad faith by destroying the evidence in order to establish a due process violation.   Arizona v. Youngblood, 488 U.S. 51, 58 (1988).   In such a case, a defendant must show that: (i) the government acted in bad faith in failing to preserve the evidence; (ii) the exculpatory value of the evidence was apparent before its destruction; and (iii) the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other means.   Monzo v. Edwards, 281 F.3d 568, 580 (6th Cir. 2002).

A habeas petitioner has the burden to establish that the police acted in bad faith in failing to preserve potentially exculpatory evidence.   Malcum v. Burt, 276 F. Supp. 2d 664, 683 (E.D. Mich. 2003).   The mere fact that the police had control over evidence and failed to preserve it is insufficient, by itself, to establish bad faith, nor will bad faith be found in the negligent, or even grossly negligent, failure to preserve potentially exculpatory evidence.   Id.; United States v. Wright, 260 F.3d 568, 571 (6th Cir. 2001).   "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."   Youngblood, 488 U.S. at 56.

In this case, there is no evidence that the missing portion of the video contained "clearly exculpatory" material.   Brown 's allegations in this regard are purely speculative.   "Where '[t]here is no indication that there was anything exculpatory' about destroyed evidence, due process has not been violated."   United States v. Jobson, 102 F. 3d 214, 219 (6th Cir. 1996) (quoting United States v. Braggs, 23 F.3d 1047, 1051 (6th Cir. 1994)).   The most that can be said

14

is that the missing portion of the video contained "potentially exculpatory" material. Consequently, <u>Youngblood</u>, rather than <u>Brady</u> or <u>Trombetta</u>, governs this issue. Brown must establish that the police or the prosecutor acted in bad faith. He fails to do so. Rather, the record indicates that Sergeant Sullivan testified that "a little over a minute" was missing from one of the surveillance camera videos and that it was due to an inadvertent error, possibly not downloading it originally or not transferring it properly. *See* 4/29/15 Trial Tr., Dkt. 12-11, PageID.759–760. Sergeant Sullivan testified that he did not alter the video in any way, <u>id.</u> at PageID.757–758, and that he attempted to get the original video from the store once he realized the error, but it no longer existed. <u>Id.</u> at PageID.760–761. Thus, while Sergeant Sullivan was responsible for the missing portion of the video, the record indicates that his conduct was, at most, negligent. Brown's conclusory allegation that Sergeant Sullivan and/or the prosecutor acted in bad faith is insufficient to justify habeas relief. <u>See</u> <u>Workman v. Bell</u>, 178 F.3d 759, 771 (6th Cir. 1998) (holding that conclusory allegations of ineffective assistance of counsel do not justify habeas relief); <u>see also</u> <u>Wogenstahl v. Mitchell</u>, 668 F.3d 307, 335–336 (6th Cir. 2012) (citing <u>Workman</u> and denying habeas relief on conclusory claims); <u>Washington v. Renico</u>, 455 F.3d 722, 733 (6th Cir. 2006) (holding that bald assertions and conclusory allegations do not provide a basis for an evidentiary hearing on habeas review).

Given the Michigan Court of Appeals' ruling and this Court's agreement that Brown failed to present evidence that the missing portion of the video was actually or even potentially exculpatory and failed to present evidence that Sergeant Sullivan or the prosecutor acted in bad faith, Brown cannot establish that trial counsel erred and/or that he was prejudiced by counsel's conduct in not seeking dismissal of the charges based upon the missing portion of the video.

Trial counsel cannot be deemed ineffective for failing to make a futile or meritless argument.

Tackett v. Trierweiler, 956 F.3d 358, 375 (6th Cir. 2020); Hoffner v. Bradshaw, 622 F.3d 487,

499 (6th Cir. 2010).[1]   Brown fails to establish that trial counsel was ineffective.

      Brown next asserts that trial counsel was ineffective for failing to object to the guilty

verdict on the felony firearm charge because the jury instruction for that charge did not include

his name with that of his co-defendants.   The Michigan Court of Appeals denied relief on this

claim.   The court explained in relevant part:

> Brown also argues that trial counsel was ineffective for failing to move to vacate
> Brown's felony-firearm conviction on the ground that the jury was not instructed
> on that offense with respect to Brown. "A court must properly instruct the jury so
> that it may correctly and intelligently decide the case." People v. Clark, 453 Mich.
> 572, 583; 556 NW2d 820 (1996). "Jury instructions must clearly present the case
> and the applicable law to the jury.... The instructions must include all elements of
> the charged offenses and any material issues, defenses, and theories if supported
> by the evidence." People v. McGhee, 268 Mich. App. 600, 606; 709 NW2d 595
> (2005). Instructional errors are presumed to be harmless, MCL 769.26, but the
> presumption may be rebutted by a showing that the error resulted in a miscarriage
> of justice. People v. Lukity, 460 Mich. 484, 493; 596 NW2d 607 (1999).
>
> Although the trial court neglected to mention Brown's name before instructing
> the jury on felony-firearm, it properly instructed the jury on the elements of that
> offense, and Brown's verdict form clearly indicated that Brown was charged with
> this offense. Accordingly, any motion to vacate the conviction based on the
> omission of his name would have been futile. Ericksen, 288 Mich. App. 201.

Brown, 2016 WL 6992194, at *7.

      The state court's decision is neither contrary to Supreme Court precedent nor an

unreasonable application of federal law or the facts.   In order for relief to be warranted on the

---

[1] Moreover, the jury was well aware that a portion of the surveillance video was missing
and trial counsel used that fact to support the defense case during closing arguments.   See 5/4/15
Trial Tr., Dkt. No. 12-13, PageID.1158–1161.

basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned.  Rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair.  Estelle v. McGuire, 502 U.S. 62, 72 (1991); Henderson v. Kibbe, 431 U.S. 145, 154 (1977).  A jury instruction is not to be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record.  Jones v. United States, 527 U.S. 373, 391 (1999); Grant v. Rivers, 920 F. Supp. 769, 784 (E.D. Mich. 1996).  The failure to give an instruction that is supported by the evidence also does not automatically justify habeas relief—the failure to instruct must have rendered the trial fundamentally unfair.  Cupp v. Naughten, 414 U.S. 141, 147 (1973); Daniels v. Lafler, 501 F.3d 735, 741 (6th Cir. 2007). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  Henderson, 431 U.S. at 155.  State law instructional errors rarely form the basis for federal habeas relief.  Estelle, 502 U.S. at 71–72.

In this case, although the trial court did not include Brown 's name while instructing the jury on the felony firearm charge, the trial court informed the jury that: "All three defendants are charged with multiple counts, that is, with the crimes of assault with intent to murder, assault with intent to do great bodily harm, carrying a weapon with unlawful intent, and felony firearm." 5/5/15 Trial Tr., Dkt. 12-14, PageID.1241.  Additionally, the prosecutor informed the trial court that it had not included Brown and co-defendant Johnson by name in the felony firearm instruction, and the Court re-instructed the jury on the felony firearm charge, but mistakenly repeated co-defendant Burney's name instead of Brown 's name, along with that of co-defendant Johnson.  Id. at PageID.1242–1243.  Lastly, according to the Michigan Court of Appeals, the verdict form for Brown included the felony firearm offense.  The Court thus concludes that the

17

jury instructions considered as a whole, along with the verdict form, were sufficient to protect Brown 's rights. Any error in failing to include his name in the felony firearm instruction at the close of trial was harmless and did not render his trial fundamentally unfair.

Given the Michigan Court of Appeals' decision that the jury instructions and verdict form were sufficient and/or that any error in excluding Brown 's name was harmless, and this Court's ruling that the jury instructions and the verdict form, considered as a whole, did not render the trial fundamentally unfair, Brown cannot establish that trial counsel erred and/or that he was prejudiced by counsel's conduct. As discussed, counsel cannot be deemed ineffective for failing to make a futile or meritless argument. <u>Tackett</u>, 956 F.3d at 375; <u>Hoffner</u>, 622 F.3d at 499. Brown fails to establish that trial counsel was ineffective. Habeas relief is not warranted on these ineffective assistance of counsel claims.

### B. Denial of Mistrial/Courtroom Closure Claim

Brown also asserts that he is entitled to habeas relief because the trial court denied his motion for mistrial based upon a partial courtroom closure. Carl contends that this claim lacks merit.

A trial court has broad discretion to grant or deny a motion for a mistrial—and a mistrial is only warranted upon a showing of manifest necessity. <u>See</u> <u>Arizona v. Washington</u>, 434 U.S. 497, 506–510 (1978) (mistrial due to deadlocked jury); <u>Walls v. Konteh</u>, 490 F.3d 432, 436 (6th Cir. 2007); <u>Clemmons v. Sowders</u>, 34 F.3d 352, 354–355 (6th Cir. 1994). "Manifest necessity" means a "high degree" of necessity. <u>Arizona</u>, 434 U.S. at 506. The Supreme Court has confirmed the significant deference due a trial court's decision to grant or deny a mistrial, as well as the further deference due the state appellate court's decision on that issue, on federal habeas

review.  See Renico v. Lett, 559 U.S. 766, 772–774 (2010) (reversing grant of habeas relief on claim contesting grant of a mistrial due to a deadlocked jury).

The Sixth Amendment guarantees a criminal defendant the right to a public trial.  Presley v. Georgia, 558 U.S. 209 (2010).  United States Supreme Court cases involving courtroom closures, however, have only involved complete courtroom closures, see, e.g., Waller v. Georgia, 467 U.S. 39 (1984) (ruling that complete exclusion of the public from suppression hearing was unjustified and identifying four factors a court should consider before closing courtroom to public); Press-Enterprise Co. v. Superior Ct. of Calif., 464 U.S. 501, 512 (1984) (ruling that exclusion of all press and public from jury voir dire during a rape trial violated the First Amendment right of public access); Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty., 457 U.S. 596 (1982) (addressing a complete exclusion of press and public from courtroom during criminal trial), with one case stating that when a limited disclosure is ordered, "the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time[.]"  Press-Enterprise Co., 464 U.S. at 512.  Consequently, the Sixth Circuit has stated that there is no clearly established Supreme Court law as to how the rules in Waller apply in cases, like Brown 's, "where some spectators but not all are removed from the courtroom."  Drummond v. Houk, 797 F.3d 400, 403 (6th Cir. 2015).  In the case of a partial closure, the only "clearly established [principle] for purposes of [a] partial closure [is] the general one that the trial court must balance the interests favoring closure against those opposing it."  Id. at 404; see also Johnson v. Rewerts, No. 22-1437, 2022 WL 16908037, at *2 (6th Cir. Nov. 2, 2022) (citing Drummond and denying a certificate of appealability).

19

Brown raised this claim on direct appeal. The Michigan Court of Appeals initially remanded the issue to the trial court to conduct a hearing and further develop the record concerning the courtroom closure. People v. Brown, No. 327734, 2016 WL 6992194, at *5 (Mich. Ct. App. Nov. 29, 2016). Following the remand, the Michigan Court of Appeals again considered the issue and denied relief on this claim. The court explained:

> As we noted in our prior opinion, during trial, witness Demond Davis became emotional during cross-examination by Burney's counsel and left the witness stand without permission. Demond informed the trial court that he felt intimidated by defendants' supporters among the courtroom spectators and also stated that he was fearful because people he believed were associated with defendants were parking outside his house, calling him, and following him. As we stated:
>
>> After Demond resumed testifying, Burney's counsel stated for the record that courtroom deputies had removed spectators, including Burney's mother, from the courtroom. All three defendants later moved for a mistrial, arguing that their right to a public trial had been violated. The trial court denied the motion, stating that it had exercised its discretion to remove spectators "because two very threatened witnesses testified, and one was indeed the victim of the crime."[People v. Brown, unpublished opinion per curiam of the Court of Appeals, issued November 29, 2016 (Docket No[s]. 327734, 327736, and 327814), slip op. at page 2].
>
> All three defendants argued on appeal that the trial court violated their right to a public trial by removing spectators from the courtroom. Because it was not clear from the record whether the closure was partial or total and because the trial court did not satisfy the four requirements set forth in Kline, 197 Mich. App. 169, we remanded the matter to the trial court to make the appropriate findings. This case now returns to us following a hearing held by the trial court on remand.
>
> At the remand hearing, several witnesses testified concerning the closure of the court during defendants' trial on April 30, 2015. Ms. Casper, the prosecutor who represented the people at the trial, testified that prior to trial and after the preliminary examination, one of the testifying witnesses (Demond's uncle) was the victim of a shooting. Based upon recorded jail telephone calls, she believes that the shooting was related to the case. Another witness did not want to testify, expressing "concern" because she knew defendants and their friends. Ms. Casper testified that Demond was concerned about testifying as well and claimed

20

that acquaintances of at least one of the defendants were hanging around his home.  As to what transpired during trial with relation to Demond, Ms. Casper testified that he was being cross-examined by one of defendant's counsel when a few people walked into the courtroom and sat in the gallery area behind defendants.  Demond looked into the gallery behind where defendants were seated and suddenly ran off the stand.  According to Ms. Casper, the judge immediately had the jury taken out of the courtroom and almost simultaneously, deputies removed people from the gallery area behind defendants.  She did not recall anyone that had sat on the prosecution's side of the gallery being escorted out or removed from the courtroom.  Ms. Casper was permitted to speak to Demond after he left the stand and, as he cried, he told her that he was terrified of one of the men who had walked in and sat behind the defense table, who he identified as "Nate." Ms. Casper recognized Nate's name from calls that had been placed from the jail during which intimidation of the prosecution's witnesses had been discussed.  Demond eventually agreed to go back to the stand and testify for his brother, Jamil, who had been shot by defendants.

Ms. Casper testified that the court recessed for lunch to allow things to calm down and when the trial resumed Demond returned to the witness stand to testify, although he was still visibly upset and crying.  According to Ms. Casper, the courtroom was not closed when the trial resumed.  Ms. Casper testified that the deputies were given a description of the individuals who had come in when Demond ran off the witness stand to keep them out of the courtroom.  Ms. Casper testified that this case stood out to her because she had such a difficult time with the witness issues and she was trying the case by herself, with no second chair. Due to the witness difficulties, her colleagues were continuously coming in to check on her, and officers were checking in as well.  Ms. Casper testified that she kept her eye on the gallery at all times due to threats to the witnesses and had the court been closed, she would have noticed an absence of people in the gallery. Her recollection is that there were always a couple of people in the gallery, some of whom she did not know, and that the courtroom thus could not have been completely closed.  She further recalled the name of a specific civilian who had tried to come in the courtroom to watch the testimony, but whom the judge made leave in case he had to be recalled as a witness, again indicating to her that the courtroom had not been completely closed.

Ms. Casper further testified that one of the defendant's mothers was one of the persons initially escorted out of the courtroom, but that she was allowed to return at some point.  Ms. Casper testified that when Nate and others entered the courtroom, they sat in the mother's vicinity, behind defendants, and at the point when Demond rushed off the witness stand; no one was entirely sure why he had suddenly become so upset.   Thus, they felt it was best to escort everyone that had been in the direction in which Demond had looked out of the courtroom until the matter was sorted out.

Defendant Brown testified at the hearing that his mother and several more of his family members were present at his trial on April 30, 2015.   Brown testified that at some point during the morning his family was escorted out of the courtroom, though they had done nothing to disrupt the courtroom and that he did not see them in the afternoon when his trial resumed.   Brown testified that when his trial resumed the next day, his family members were present in the courtroom. Brown's trial attorney, David Cripps, testified that after Demond ran off the stand, he believes the trial court issued an order closing the courtroom to the public for the day.

Defendant Johnson likewise testified that during his trial on April 30, 2015, his family members and friends were escorted out of the courtroom. He did not see them when the trial resumed that afternoon.   Rhonda Johnson, defendant Johnson's sister, testified that she was present for her brother's trial on April 30, 2015, and when a witness walked off the stand, she and the rest of the people in the gallery on the defendant's side were escorted out of the courtroom by a deputy. She testified that she was not allowed back into the courtroom that day, but did come back on later days. Johnson's trial counsel, Arnold Weiner, testified that when a witness unexpectedly left the stand, he recalls that the trial judge adjourned the matter for a period of time, but could not recall if the courtroom was cleared of the public at any time.

Evan Callahan, trial counsel for defendant Burney, testified that when Demond left the witness stand during his testimony, Burney's mother was escorted out of the courtroom.   Callahan objected to her removal and asked that she be allowed back in, and he believes she was thereafter allowed to stay in the courtroom. Callahan could not recall if the courtroom was ultimately cleared.

After the witnesses concluded testifying, the trial judge referred back to the trial transcript and indicated that he had stated that he was leaving the court closed until Demond had finished testifying, indicating that his closure was clearly just a partial closing.   The trial judge stated that his reason for the closure was for the protection of the witness as well as for the efficient running of the trial, given that the jury had witnessed everything that the judge, the lawyers, and the defendants had observed.

The hearing record satisfactorily establishes that the closure in this case was partial, rather than total.   "A partial closure occurs where the public is only partially excluded, such as when family members or the press are allowed to remain, or when the closure order is narrowly tailored to specific needs." People v. Kline, 197 Mich. App. 165, 170 n 2; 494 N.W.2d 756 (1992) (internal citation omitted).   It appears undisputed that only those associated with defendants were cleared from the courtroom.   Moreover, the courtroom was cleared of those

associated with defendants only during Demond's testimony.   While Rhonda Johnson testified that after Demond testified she was not allowed back in the courtroom, there is no indication that she attempted to go back into the courtroom and was denied entry. And, there was testimony that at least one defendant's mother was allowed back into the court later in the day and that one witness came back into the courtroom but was asked to leave because he may have been potentially recalled as a witness. The above testimony, as well as the trial judge's statement that he only partially closed the courtroom, is sufficient to establish that the court room was only partially closed.

The articulated reasons for the closure, for the safety of the testifying witness and efficient running of the trial, were substantial enough to justify the partial closure. Demond was clearly shaken by the appearance of a person in the gallery—to the extent that he disrupted the trial.   He expressed concern for his safety and Ms. Casper recognized the name of the person who caused Demond fear as a person who had been named or involved in recorded jailhouse threats toward Demond and other prosecution witnesses.

At the conclusion of the evidentiary hearing, the trial court specifically addressed the four factors applicable to the closure of court proceedings set forth in Kline, 197 Mich. App. at 169.   As to the first factor, that the closure need address an overriding interest that is likely to be prejudiced, the trial court again indicated that the safety of a witness was at stake and required the partial closure.   We agree that this interest was sufficient to justify the partial closure.

The second Kline factor requires that the closure be no broader than necessary. Id. We agree with the trial court that the closure of the court only while the one witness was testifying was limited and thus not broader than necessary to protect the safety of the testifying witness.   With respect to the third factor, the consideration of any reasonable alternatives to the partial closure, the trial judge admitted that he struggled with that factor.   He stated that the partial closure was actually begun by deputies trying to control people coming in and out of the courtroom when Demond "astonishingly" just got up and left the stand. The trial judge stated that his concern was that the jury was sheltered from any interaction between witnesses, the deputies, and spectators, so that no prejudice to the defendants occurred and he saw no real alternative but to partially close the courtroom, given that the fear from the witness was happening ten feet away from the jury.   Given the unpredictable nature of this occurrence, the speed at which it occurred, and Demond's continued expression of fear, we find that the trial court's determination of no reasonable alternative to a partial closure of the courtroom was sound.   Finally, we find that the trial court's articulation on the record of its findings is adequate to support its partial closure of the courtroom, thus satisfying the fourth Kline requirement.   Id.

23

> As we have held that the closing of the courtroom was partial and did not violate
> any of the defendants' rights to a public trial....

People v. Brown, No. 327734, 2017 WL 1367178, at *1–*4 (Mich. Ct. App. Apr. 13, 2017)

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.   First, as discussed by the Michigan Court of Appeals, the record reflects that the courtroom closure in this case was a partial closure, not a full closure, as only spectators associated with the defendants were excluded from the courtroom and the closure was limited to the testimony of one witness.   Second, the purpose of the closure was to protect the testifying witness who felt intimidated and threatened by certain spectators, to shield the jury from conduct that could be prejudicial, and to preserve the decorum of the trial.  Such reasons can justify a courtroom closure.   See Presley v. Georgia, 558 U.S. 209, 215 (2010) ("There are no doubt circumstances where a judge could conclude that . . . safety concerns are concrete enough to warrant closing voir dire."); Nolan v. Money, 534 F. App'x 373, 380 (6th Cir. 2013) ("[C]ourts have held that the need to protect a witness from intimidation justifies closure of the courtroom."); Williams v. Rivard, No. 1:13-CV-14493, 2018 WL 1609963, at *9 (E.D. Mich. Apr. 3, 2018) (denying habeas relief on similar claim), aff'd sub nom. Williams v. Burt, 949 F.3d 966 (6th Cir. 2020).   Third, the trial court reasonably determined that there was no better alternative to the partial closure, which was limited in scope and time to protect the witness, the jury, and the integrity of the trial.   See Drummond, 797 F.3d at 401–402, 404 (upholding partial closure of courtroom where one spectator was disrespectful to the deputies and the court, another was charged with assault after an altercation in the courthouse, and some jurors and witnesses felt threatened); see also Johnson v. Rewerts, No. 2:20-CV-12165, 2022 WL 1094645, at *9 (E.D. Mich. April 12, 2022) (denying habeas relief on same claim raised by co-defendant

24

Johnson), certificate of appealability denied, No. 22-1437, 2022 WL 16908037 (6th Cir. Nov. 2, 2022), cert. denied, 143 S.Ct. 989 (Feb. 27, 2023).   Brown fails to establish a violation of his constitutional rights or that manifest necessity warranted the grant of a mistrial.   Habeas relief is not warranted on this claim.

### C.   Sentencing Claims

Lastly, Brown asserts that he is entitled to habeas relief because the trial court erred in imposing his sentence.   Specifically, he asserts that the trial court sentenced him based upon facts neither admitted by him nor proven beyond a reasonable doubt to the jury in violation of his Sixth Amendment rights, that his sentences are unreasonable, and that he was improperly sentenced as a fourth habitual offender.

A sentence imposed within the statutory limits is generally not subject to federal habeas review.   Townsend v. Burke, 334 U.S. 736, 741 (1948); Cook v. Stegall, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999); see also Hutto v. Davis, 454 U.S. 370, 373–374 (1982) (finding that federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature).   Claims that arise out of a state trial court's sentencing decision are not normally cognizable upon habeas review unless the petitioner can show that the sentence imposed exceeded the statutory limits or is wholly unauthorized by law.   Lucey v. Lavigne, 185 F. Supp. 2d 741, 745 (E.D. Mich. 2001).   Brown 's sentences are within the statutory maximum sentences for a fourth habitual offender.   See Mich. Comp. L. § 750.83 (authorizing a maximum sentence of life imprisonment for assault with intent to commit murder); § 750.226 (authorizing a maximum sentence of 5 years imprisonment for carrying a weapon with unlawful intent); § 750.224f (authorizing a maximum sentence of 5 years imprisonment for felon in possession); §

750.224b (authorizing a maximum sentence of 5 years imprisonment for felony firearm, second offense); § 769.12 (authorizing enhanced sentences for fourth habitual offenders). Consequently, his sentences are insulated from habeas review absent a federal constitutional violation.

Brown first asserts that his sentencing was improper because the trial court engaged in judicial fact-finding and relied upon facts neither admitted by him nor proven beyond a reasonable doubt in imposing his sentence.   Brown raised this claim on direct appeal.   The Michigan Court of Appeals initially reserved ruling on the issue pending resolution of the public trial claim, People v. Brown, No. 327734, 2016 WL 6992194, at *8 (Mich. Ct. App. Nov. 29, 2016), then subsequently remanded the issue to the trial court to determine whether it would have imposed a materially different sentenced if the guidelines had been advisory pursuant to People v. Lockridge, 870 N.W.2d 502 (Mich. 2015).   Brown, 2017 WL 1367178, at *5–*8.   On remand, the trial court ruled that certain offense variables were not scored based upon judicial fact-finding, scored the disputed offense variables the same as it had previously, and concluded that it would not change Brown 's original sentences.   See 12/18/17 Hrg., Dkt. 12-20.   Following the remand, the Michigan Court of Appeals affirmed his sentences.   Brown, 2019 WL 2194994, at *2–3

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.   This sentencing claim arises from the United States Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466 (2000), Blakely v. Washington, 542 U.S. 296 (2004); and Alleyne v. United States, 570 U.S. 99 (2013). In Apprendi, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted

26

to a jury, and proved beyond a reasonable doubt." <u>Apprendi</u>, 530 U.S. at 490.   In <u>Blakely</u>, the Supreme Court clarified "that the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." <u>Blakely</u>, 542 U.S. at 303.   In <u>Alleyne</u>, the Supreme Court extended <u>Apprendi</u> to mandatory minimum sentences, ruling that any fact that increases a mandatory minimum sentence is an "element" of the offense that must be submitted to the jury and proven beyond a reasonable doubt. <u>Alleyne</u>, 570 U.S. at 111–112.

In <u>Lockridge</u>, the Michigan Supreme Court held that, under <u>Alleyne</u>, the Michigan sentencing guidelines violate the Sixth Amendment because the guidelines "require judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables that <u>mandatorily</u> increase the floor of the guidelines minimum sentence range[.]" <u>Lockridge</u>, 870 N.W.2d at 506 (emphasis in original).   The court thus struck the mandatory portions of the guidelines made the guidelines advisory only. <u>Id</u>. at 520–521.   The remedy under <u>Lockridge</u> is a remand for the trial court to determine whether it would impose a materially different sentence absent the mandatory guidelines. <u>Id</u>. at 522–524 (citing <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005)).   If the answer is yes, re-sentencing is required. <u>Id</u>

The Sixth Circuit has since issued a decision agreeing with <u>Lockridge</u> and ruling that <u>Alleyne</u> clearly established that Michigan's pre-<u>Lockridge</u> mandatory minimum sentencing guidelines scheme violated the Sixth Amendment. <u>Robinson v. Woods</u>, 901 F.3d 710, 716–718 (6th Cir. 2018).   The Sixth Circuit explained that "[a]t bottom, Michigan's sentencing regime violated <u>Alleyne</u>'s prohibition on the use of judge-found facts to increase mandatory minimum sentences." <u>Id</u>. at 716.   This Court is bound by the Sixth Circuit's decision.

In this case, Brown was sentenced on May 20, 2015, after Alleyne was decided and before Lockridge made Michigan's sentencing guidelines advisory on July 29, 2015.   Consequently, his sentences were imposed in violation of the Sixth Amendment to the extent that any of the offense variables were scored based upon judicially found facts neither admitted by him nor proven beyond a reasonable doubt.   That being said, Brown is nonetheless not entitled to relief on this claim.   As explained by the Michigan Court of Appeals and as the record shows, Brown was afforded a Crosby hearing and the trial court stated that it would not impose a different sentence. The Michigan Court of Appeals' determination was reasonable.   "The United States Supreme Court has not clearly established whether a defendant sentenced under an unconstitutional sentencing scheme is entitled to a full re-sentencing or only a Crosby hearing." Morrell v. Wardens, 12 F.4th 626, 632 (6th Cir. 2021) (citing cases).   And the Sixth Circuit has held that "a Crosby remand is not contrary to or an unreasonable application of clearly established federal law." Id. at 633 (citing Reign v. Gidley, 929 F.3d 777, 780–783 (6th Cir. 2019)).   Given that Brown was afforded a Crosby hearing and fails to show that re-sentencing is required to protect his rights, there is no additional relief for this Court to grant.

Additionally, Brown is not entitled to habeas relief on any claim challenging the scoring of the offense variables of the sentencing guidelines.   Such a claim is not cognizable on federal habeas review because it is a state law claim.   See Tironi v. Birkett, 252 F. App'x 724, 725 (6th Cir. 2007); Howard v. White, 76 F. App'x 52, 53 (6th Cir. 2003) ("A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state concern only."); see also Kissner v. Palmer, 826 F.3d 898, 904 (6th Cir. 2016); McPhail v. Renico, 412 F. Supp. 2d 647, 656 (E.D. Mich. 2006).   Alleged errors in scoring the offense variables and

28

determining the sentencing guideline range do not warrant federal habeas relief.   State courts are the final arbiters of state law and federal courts will not intervene in such matters.   <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990); <u>Oviedo v. Jago</u>, 809 F.2d 326, 328 (6th Cir. 1987); <u>see also</u> <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting on habeas review."); <u>Sanford v. Yukins</u>, 288 F.3d 855, 860 (6th Cir. 2002).   Habeas relief does not lie for perceived errors of state law.   <u>Estelle v. McGuire</u>, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

A sentence may violate federal due process, however, if it is carelessly or deliberately pronounced on an extensive and materially false foundation which the defendant had no opportunity to correct.   <u>Townsend</u>, 334 U.S. at 741; <u>see also</u> <u>United States v. Tucker</u>, 404 U.S. 443, 447 (1972) (citing <u>Townsend</u>, 334 U.S. 736); <u>United States v. Sammons</u>, 918 F.2d 592, 603 (6th Cir. 1990) (holding that defendant must have a meaningful opportunity to rebut contested sentencing information).   To prevail on such a claim, a petitioner must show that the court relied upon the allegedly false information.   <u>United States v. Polselli</u>, 747 F.2d 356, 358 (6th Cir. 1984); <u>Draughn v Jabe</u>, 803 F. Supp. 70, 81 (E.D. Mich. 1992).   Brown makes no such showing.   He had a sentencing hearing (and a <u>Crosby</u> hearing) before the trial court with an opportunity to contest the scoring of the guidelines and the sentencing decision.   Brown fails to establish that the trial court relied upon materially false or inaccurate information in imposing his sentences which he had no opportunity to correct.   He was afforded all the process he was due.

Brown is also not entitled to habeas relief on any claim that his sentences are unreasonable due to their length relative to his age.   A claim that a sentence is disproportionate is not cognizable on federal habeas review because it is a state law claim.   See Harmelin v. Michigan, 501 U.S. 957, 965 (1991) (ruling that the Eighth Amendment does not require strict proportionality and that Michigan prisoner's claim that his sentence was disproportionate was not cognizable on habeas review); Clarmont v. Chapman, No. 20-1205, 2020 WL 5126476, at *1 (6th Cir. July 13, 2020) ("[A]ny state law challenge to the reasonableness of [petitioner's] sentence or argument that his sentence is disproportionate under state law is also not cognizable on habeas review.").   There is no federal constitutional right to individualized sentencing.   United States v. Thomas, 49 F.3d 253, 261 (6th Cir. 1995).   As noted, state courts are the final arbiters of state law and federal courts will not intervene in such matters.   Lewis, 497 U.S. at 780; Oviedo, 809 F.2d at 328.

Brown also cannot establish that his sentences constitute cruel and unusual punishment under the Eighth Amendment.   The United States Constitution does not require strict proportionality between a crime and its punishment.   Harmelin, 501 U.S. at 965.   A sentence that falls within the maximum penalty authorized by statute "generally does not constitute 'cruel and unusual punishment.'"   Austin v. Jackson, 213 F.3d 298, 302 (6th Cir. 2000) (citation omitted).   As noted, Brown's sentences are within the statutory maximums.   The trial court thus acted within its discretion in sentencing Brown and there is no extreme disparity between his crimes and sentences so as to offend the Eighth Amendment.

Lastly, Brown asserts that his fourth habitual offender sentencing enhancement is improper because the habitual offender notice was not timely filed.   Brown raised this claim on

direct appeal.  The Michigan Court of Appeals initially reserved ruling on the issue pending resolution of the public trial claim, <u>Brown</u>, 2016 WL 6992194, at *8, then subsequently denied relief on the claim.  The court found that "the information was prepared on December 6, but not filed until after the preliminary examination," that it "contained the required notice of intent to seek an enhanced sentence," and that it "listed Brown's prior convictions (for attempted receiving or concealing stolen property, attempted first-degree home invasion, and two counts of delivery of less than 50 grams of cocaine), and concluded that Brown "fails to establish non-compliance with MCR 6.112," which governs habitual offender sentencing enhancement notification. <u>People v. Brown</u>, No. 327734, 2017 WL 1367178, at *5 (Mich. Ct. App. Apr. 13, 2017).

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.[2]  First, Brown 's claim that he received inadequate notice of the habitual offender enhancement under Michigan law fails to state a claim which is cognizable on federal habeas review.  See <u>Tolbert v. LeCureaux</u>, 811 F. Supp. 1237, 1240–1241 (E.D. Mich. 1993); <u>see also</u> <u>Threat v. Harry</u>, No. 2:17-CV-12465, 2018 WL 2431707, at *7 (E.D. Mich. May 30, 2018) (denying similar claim); <u>MacArthur v. Curtin</u>, No. 13-CV-11307, 2014 WL 3767835, at *15–16 (E.D. Mich. July 31, 2014) (adopting magistrate judge's report and citing cases).  As discussed, habeas relief may not be based upon a perceived state law error.  <u>Estelle</u>, 502 U.S. at 67–68.

Second, due process does not require that a defendant be given advance notice that a trial on a substantive criminal charge will be followed by a habitual offender sentencing enhancement.

---

[2] The Court would reach the same result under a de novo standard of review.

Due process only requires that a defendant be given reasonable notice and an opportunity to be heard on such a matter.  Oyler v. Boles, 368 U.S. 448, 452 (1962).  The record in this case shows that the prosecutor filed a fourth habitual offender notice before trial and that Brown had the opportunity to challenge his sentencing enhancement during the proceedings before the state trial court (and state appellate courts).  Due process requires nothing more.  Id. at 452–454.  Moreover, Brown does not dispute that he had three prior felony convictions which justified the fourth habitual offender sentencing enhancement.  He thus fails to establish a violation of his constitutional rights as to this issue.  See Johnson, 2022 WL 1094645, at *11–12 (denying habeas relief on same claim raised by co-defendant Johnson).  Habeas relief is not warranted on these sentencing claims.

## V.    Conclusion

For the reasons stated, the Court concludes that Brown is not entitled to federal habeas relief on his claims.  Accordingly, the Court denies and dismisses with prejudice the petition for a writ of habeas corpus.

Before Brown may appeal, a certificate of appealability ("COA") must issue.  See 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A COA may issue only if a petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a federal district court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claims debatable or wrong.  Slack v. McDaniel, 529 U.S. 473, 484–485 (2000).  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

32

In this case, Brown fails to make a substantial showing of the denial of a constitutional right as to his habeas claims.   Accordingly, the Court denies a COA.

Lastly, the Court concludes that an appeal cannot be taken in good faith.  See Fed. R. App. P. 24(a).   Accordingly, the Court denies leave to proceed in forma pauperis on appeal.

SO ORDERED.

Dated:  October 6, 2023                         s/Mark A. Goldsmith
       Detroit, Michigan                         MARK A. GOLDSMITH
                                            United States District Judge